## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LINDA KAY ROCHEK,        )
                            )
          Plaintiff,     )    Civil Action No. 2:12-cv-01307
    v.                  )
                            )    Judge Mark R. Hornak
CAROLYN W. COLVIN,[1] *Acting*  )
*Commissioner of Social Security*,  )
                            )
          Defendant.   )
                            )

## OPINION

**Mark R. Hornak, United States District Judge**

Plaintiff Linda Rochek brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433 ("Act"). This matter comes before the Court upon cross-motions for summary judgment. ECF Nos. 9, 11. The record has been developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment, ECF No. 11, will be granted in part and denied in part, and Defendant's Motion for Summary Judgment, ECF No. 9, will be denied.

## I.    PROCEDURAL HISTORY

Plaintiff filed for DIB on March 19, 2009. R. 9. Plaintiff was initially denied benefits on July 24, 2009. *Id.* A hearing was held on March 14, 2011 via videoconference before Administrative Law Judge William H. Gitlow ("ALJ"). *Id.* Plaintiff appeared to testify and was

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, succeeding former Commissioner Michael J. Astrue. Social Security History–Social Security Commissioners, http://www.ssa.gov/history/commissioners.html (visited on July 15, 2013). Consequently, Acting Commissioner Colvin is now the official-capacity defendant in this action. *Hafer v. Melo*, 502 U.S. 21, 25 (1991); Fed. R. Civ. P. 25(d).

represented by counsel. *Id.* Gina Baldwin, an impartial vocational expert ("VE"), along with Plaintiff's husband, Gary Rochek, also testified at the hearing. *Id.*

On April 15, 2011, the ALJ rendered an unfavorable decision to Plaintiff. R. 6. He found that Plaintiff suffered from the severe impairments of congenital sensorineural hearing loss by history, and refractory lumbar back pain/postlaminectomy syndrome since October 15, 2003. R. 12. He determined that (1) Plaintiff's impairments did not meet or equal one of the listed impairments as defined in 20 C.F.R. Pt. 404, Subpt. P, App. 1, and (2) while Plaintiff did not have the residual functional capacity ("RFC") to return to her previous relevant work, she retained the ability to perform sedentary work (with certain limitations due to her abilities), as a surveillance system monitor, grader/sorter, or bench worker, and therefore was not "disabled" within the meaning of the Act. R. 19-20.

Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on August 9, 2012, thereby making the decision of the ALJ the final decision of the Commissioner. R. 1. This appeal followed. Plaintiff asserts three challenges to the ALJ's decision: (1) the ALJ improperly weighed the medical opinion evidence in making his RFC assessment, and therefore it is not supported by substantial evidence; (2) the ALJ wrongly found Plaintiff's complaints of pain to be not credible; and (3) The ALJ failed to portray Plaintiff's hearing impairment in his questions to the Vocational Expert (VE). Plaintiff requests that the decision of the ALJ be reversed and that she be awarded DIB benefits or, in the alternative, that the case be remanded to the Commissioner. Pl's Br. at 21, ECF No. 12.

## II.    FACTUAL HISTORY

### A.    Lower Back Surgery

It is uncontroverted that Plaintiff had suffered from severe lower back pain beginning around 2002 and increasing until 2007, for which she had seen a number of doctors. R. 12-13. She was diagnosed by Howard Senter, M.D., a neurosurgeon, with degenerative disc disease and disc herniation at L5-S1. R. 344; 362. On June 20, 2007, Ms. Rochek was first referred to Todd Pepper, D.O. at the Institute for Pain Medicine, to discuss pain management. R. 506. On October 3, 2007, Dr. Senter performed surgery on Ms. Rochek, in which he conducted an L5-S1 discectomy (anterior lumbar fusion). R. 344-45.

Initially, it appeared as if the surgery had succeeded in at least somewhat improving her back pain, with Dr. Senter noting in November 2007 and January 2008 that her back pain was "markedly improved," with some residual left leg pain. R. 360; 496. Plaintiff underwent physical therapy, attending approximately 22 appointments from January to March 2010, R. 380-404. For example, she told the therapist on intake that she experienced "more stability and less pain since surgery," but that her pain was still a "5/10," R. 382; on February 4, 2008, she had "some discomfort," R. 396, but on March 25, 2008, it was noted she "is having less pain. She is doing well." R. 404. It appears that that was the last physical therapy session she attended.

Still, Ms. Rochek saw Dr. Pepper on February 27, 2008 in which she reported that while she received a "distinct benefit with physical therapy post-op," her "pain intensity is the same and . . . the quality is very similar to the pain prior to surgery." R. 496. Dr. Pepper noted that Ms. Rochek had been taking prescriptions of Oxycontin and oxycodone for pain following her surgery, and that in general the medicine had been "effectively controlling her pain and

3

improving her function without undesired side effects," for which reason he slightly increased her dosage. R. 497.

## B. Dr. Pepper

From February 2008 until October 2010, Ms. Rochek saw Dr. Pepper approximately once a month, which he recorded in detailed notes. *See generally* R. 470-496; 569-597. The trajectory of those visits can be summarized as follows:

- Dr. Pepper noted from the beginning that opioids were only intended as a "stopgap" measure of pain management, but noted that they were effective in helping to manage Plaintiff's pain throughout.
- From the beginning, Dr. Pepper encouraged Ms. Rochek to try a variety of other measures for pain management, including a variety of muscle relaxers and spinal cord stimulation (SCS), all of which Ms. Rochek refused, mostly without trying them:
    o In April 2008, Plaintiff was prescribed, but did not take muscle relaxant baclofen, because she was "afraid of the side effects", R. 492;
    o In May 2008, Plaintiff started taking baclofen, but discontinued because she was "feeling nervous" and had tremors, R. 489;
    o In July 2008, Plaintiff was prescribed, but did not take anti-pain drug methadone, because of the "stigma associated with it," and continually refused recommendation to try it, R. 487;
    o In September and October 2008, Plaintiff was recommended spinal cord stimulator (SCS) trial, but wanted to "think about" it, R. 286, 486, and SCS was recommended to her on multiple occasions through 2010, *see* R. 570.
- Dr. Pepper noted continuously from February 2008 until September 2009 that Ms. Rochek demonstrated "no signs of pain behavior, symptom modification, or drug seeking behavior." *E.g.* R. 496, 586.
- He also noted continuously from September 2008 to October 2010 his "Impression" that Ms. Rochek suffered from "chronic low back pain." R. 470, 472, 474, 476, 478, 480, 483, 485, 592, 570, 594, 597.
- From around November 2008 until March 2009, Dr. Pepper encouraged Plaintiff to seek out a second opinion from other neurosurgeons regarding treatment options, which required certain imaging to be done. R. 480, 478, 476, 474, 472.

- In February 2009, Dr. Pepper observed a recent MRI of Plaintiff's lower back which demonstrated "degenerative disk disease at L4-L5" and "postoperative changes at L5-S1." R. 474.
- In April 2009, Plaintiff told Dr. Pepper about the results of a CT scan from a neurosurgeon, Dr. Spiro, and that he recommended surgery, but she was "apprehensive", and noticed "increased pain in her back." R. 270.
- In May 2009, for the first time, Dr. Pepper noted Plaintiff's "possible psychologic dependence" on opiates. 597.

4

- For the first and only time, in September 9, 2009, Dr. Pepper noted possible "symptom magnification" when she refused to have a physical exam of her back done. R. 586-87.
- In January 2010, Dr. Pepper noted that Plaintiff "refuses any surgery or spinal cord stimulation trial," citing financial resources. That "chronic opioid therapy" "may represent a failed treatment plan as she is 44 years old and has been unable to resume any unemployment," R. 581.
- Dr. Pepper noted from January 2010 through October 2010 increasing frustration with Plaintiff's "noncompliance" with his treatment recommendations. *See* R. 16.
- In his notes from her last visit on October 1, 2010, Dr. Pepper noted for the first time that Plaintiff exhibited "drug seeking behavior," although she still did not display any pain behavior or symptom magnification. R. 569. He noted her refusal of all other offered treatments, and said, "In the event that the patient remains uninterested in trialing other potential targeted treatments . . . I regrettably will have little else to offer her." R. 570.

## C.    Other Treating Physicians

In early 2009, as recommended by Dr. Pepper, Ms. Rochek sought out the advice of two neurologists in the same practice, Joseph Maroon, M.D. and Richard Spiro, M.D. In February 2009, Dr. Maroon noted that an MRI done on Ms. Rochek a month earlier revealed "postoperative changes at L5-S1 and degenerative disk disease at L4-L5," and he referred her to Dr. Spiro. R. 451. The ALJ's decision never mentions Dr. Maroon. On March 11, 2011, Dr. Spiro noted that Plaintiff is "still non-functional and unable to work or perform her daily activities without significant pain." R. 458. He noted that the imaging she provided showed "evidence of non-fusion" in her lower spine. *Id.* He ordered a CT scan done of Plaintiff's back, which also revealed non-fusion. R. 621. Based on this, on March 25, 2009, Dr. Spiro recommended to Ms. Rochek that she undergo additional surgery – another L5-S1 interbody fusion. *Id.* Dr. Pepper's notes reflect that Ms. Rochek passed on Dr. Spiro's conclusions to him, but she never sent Dr. Pepper Dr. Spiro's report. R. 586, 596. Interestingly, it appears that this report was not part of the initial record, but was later added at some point still prior to the ALJ

5

rendering his decision, but the ALJ noted that it "had already been factored into [his] decision" and did not alter it. R. 18.

Additionally, at Dr. Pepper's suggestion, Plaintiff consulted Jose Ramirez DelToro, M.D., an orthopedic surgeon. Dr. DelToro saw Plaintiff on June 24, 2010, physically examined her, and reviewed an MRI of her lower back. R. 566-67. Dr. DelToro's notes reflect that he spoke with Ms. Rochek about three different options for her back pain: surgery, as recommended by Dr. Spiro; a spinal cord stimulator; and "aggressive physical therapy with exercises." R. 567. In particular, he noted that he could "certainly get her in the hands of someone to do spinal cord stimulation to decrease oral pain medication intake." *Id.* On August 18, 2010, Dr. DelToro noted that Ms. Rochek came in to know if he knew of any other pain management physician she can go to "because she does not like the long drive to West Penn Hospital." R. 654.

On October 8, 2010, Ms. Rochek first went to Brian Mudry, M.D., who would become her new primary care physician. R. 598. On that visit, Dr. Mudry noted "no muscle pain, no decreased range of motion," but back pain that was "moderate," located "bilaterally, in the lower region." *Id.* He also noted a prescription for Ms. Rochek of 15mg of oxycodone every 6 hours (or four times a day), R. 599, though Dr. Pepper last noted a prescription of 15mg three times a day, R. 572. Dr. Mudry's notes do not indicate any discussion of prescription amounts. The record contains notes from Dr. Mudry's of four more visits, up to early 2011. R. 601-616. On October 14, and November 8, 2010, Dr. Mudry treated Plaintiff's high blood pressure. R. 601-610. On December 6, 2010, Dr. Mudry again treated her blood pressure, and also described that Plaintiff "has suffered an exacerbation of low back pain." R. 611. He again noted "moderate" bilateral back pain, as well as "bilateral, posterior, paraspinal muscle tightness w/ tenderness to palpatation; pt is shuffling when she walks." R. 611-612. It appears that on that date, Dr.

Mudry's notes reflect that Plaintiff's Oxycontin dosage changed to 60mg twice a day, R. 611, when it was previously 40mg three times a day, R. 605. On February 3, 2011, the last date of Dr. Mudry's notes in the record, he saw Ms. Rochek for a rash on her arms; he noted "no muscle pain; no decreased range of motion," but made no comment on her back pain. R. 614.

### D.   Medical Opinions

The record contains three medical opinions and one Consultative Examiner's (CE's) report. The first is from Jeffrey Freeman, D.C., dated May 12, 2009, who explained that he first saw and evaluated Ms. Rochek in 2002 for back pain, and last saw her on June 2, 2006, where she reported back pain "rendering her barely able to get out of the chair." R. 522-523. Based on his observations of Ms. Rochek and her imaging leading up to June 2006, Dr. Freeman opined that Ms. Rochek could only stand or walk 2-4 hours in an 8 hour work day, and sit 2-4 hours. R. 524. He noted she could "never" engage in tasks such as bending, kneeling, stooping, crouching, etc. R. 525.

The second opinion is from Abu Ali, M.D., dated July 20, 2009, which appears to have been a consultative examination. R. 552-555. Dr. Ali saw and evaluated Ms. Rochek on July 8, 2009, and reviewed her CT scan from March 25, 2009, noting that it reflected a "partially fused interbody graft . . . resulting in mod Lt neural foraminal narrowing and mild narrowing of the left lat recess." R. 554. Ms. Rochek described to him "daily activities that are significantly limited," Dr. Ali wrote that while her "statements regarding current limitations may be credible . . . [t]here is inadequate evidence available to assess credibility." R. 555. Dr. Ali noted in a check-box form that he believed Ms. Rochek could stand or walk about 6 hours in an 8 hour work day, and sit about 6 hours. R. 550. He also referred to an "audio" test that was performed on the Plaintiff in February 2008, though that test is not part of the record here. R. 554. He concluded that Ms.

Rochek's hearing was "limited," but did not believe that her noise exposure needed to be limited. R. 552.

The third opinion is from Dr. Mudry, dated February 14, 2011, and is a "check box" form with the only accompanying notes being "chronic back pain w/ lower extremity radiculopathy." R. 619-620. In Dr. Mudry's opinion, Plaintiff could only sit, stand, and walk less than 2 hours each in an 8 hour day. R. 617. He indicated she could never bend, stoop, crawl, climb, etc., that she needed to lie down or sit in a recliner "for a substantial period of time during the day," and she needs "complete freedom to rest frequently throughout the day." R. 619.

The record also contains a report from consultative examiner Jeffrey Banyas, M.D. dated July 8, 2009 who conducted a medical evaluation (audiometry) of Ms. Rochek's hearing on July 6, 2009. R. 541-548. That evaluation "revealed a bilateral sensorineural hearing loss with good symmetry and fair-to-poor speech discrimination bilaterally." R. 544.

### D.    Hearing Testimony

At the administrative hearing, Ms. Rochek testified that prior to her injury, she worked and often played golf, tennis, and basketball. R. 63. She stated that she can only sleep for approximately two hours at a time during the night due to her pain. R. 60-61, 64-65. She does certain light tasks around the house during the day, but has to lie down after any physical activity, and spends approximately 90 percent of her day "doing nothing." R. 61-63. She stated that, on a scale of 1 to 10, her pain averages around a "3" but can get aggravated to a "5." R. 67. Mr. Rochek testified that he "married a very active woman," but now he has taken over 90 percent of household chores,   and his wife has to lie down constantly throughout the day, comprising a total of about half of the day. R. 72-73.

## IV.  STANDARD OF REVIEW

This Court's review is plenary with respect to all questions of law. *Schandeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). With respect to factual issues, judicial review is limited to determining whether the Commissioner's decision is "supported by substantial evidence." 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F. 3d 43, 46 (3d Cir. 1994). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotation marks omitted). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F. 3d 358, 360 (3d Cir. 1999).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents [her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Sec'y of Health & Human Serv.*, 841 F. 2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F. 2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if [her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v.Sec'y of Health, Educ. & Welfare*, 714 F. 2d 287, 290 (3d Cir. 1983). The administrative law judge

must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F. 2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F. 2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), has promulgated a familiar five-step sequential evaluation process for determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that [s]he is not working at a "substantial gainful activity."[20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find nondisability unless the claimant shows that [s]he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [her] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless [s]he shows that [s]he cannot, [s] he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24–25 (2003) (footnotes omitted).

## V.    DISCUSSION

### A.    RFC Assessment of Pain: Credibility

Plaintiff's primary argument is that the ALJ erred in his RFC assessment when he found Plaintiff's reports of the severity of her pain to be not credible, in particular because he concluded that addiction to painkillers, not pain, prompted her physicians' visits. While this finding of the ALJ is closely related to his discrediting of the opinion of Dr. Mudry, Plaintiff's treating physician, the Court will discuss that separate finding below.

10

"Where medical evidence does support a claimant's complaints of pain, the complaints should then be given 'great weight' and may not be disregarded unless there exists contrary medical evidence." *Burns v. Barnhart*, 312 F.3d 113, 130 (3d Cir. 2002) (quoting *Mason v. Shalala*, 994 F2d, 1058, 1067-68 (3d Cir. 1993)).

The ALJ concluded that Ms. Rochek had the following capacity:

> Lifting/carrying no more than ten pounds maximum occasionally and five pounds maximum frequently; only occasionally climb, balance, stoop, kneel, crouch, and crawl; should avoid vibration, unprotected heights, dangerous moving machinery; wet conditions, and excessive dust, fumes, and gases; should avoid exposure to loud noise without hearing protection; and has the need to alternate sitting/standing at 30-minute intervals.

R. 14. The ALJ, in reaching his RFC assessment, gave Dr. Mudry's opinion "little weight," because "the evidence as a whole does not credibly support that the claimant has been so limited at any time relevant to this decision." R. 17. It also did not give Dr. Freeman's opinion much weight, as Dr. Freeman's 2009 report relied on "objective findings from an examination three years earlier." R. 18. The decision makes no mention of Dr. Ali's opinion. The thrust of the ALJ's decision rested on the fact that he found Plaintiff to be not credible: although he believed that her "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above" RFC. R. 15.

The Court agrees with Ms. Rochek that in making this assessment, the ALJ erred, because he permitted the evidence of Ms. Rochek's addiction to painkillers to wholly eclipse the strong evidence of the veracity of her pain. He found that "to the undersigned, the record is clear that for the claimant, the issue is not one of pain – not of present pain, not of future pain reduction. The issue is how can the claimant continue to procure her opiates. . . ." R. 17; *see also*

R. 15 ("the issue is *not* one of pain, *but* of addiction.") (emphasis added). In short, the ALJ erred in assuming that the two are mutually exclusive.

To be sure, the ALJ properly relied on evidence in the record indicating that Ms. Rochek may have been increasingly becoming addicted to and dependent on her pain medication, in particular Dr. Pepper's report on October 1, 2010 that she exhibited "drug-seeking behavior" as well as "chronic opioid dependence and tolerance," R. 569-70, and on April 6 and July 6, 2010 noting her "psychological dependence" on oxycodone, R. 575, 579. The record also contained evidence of two possibly inconsistent statements made to her doctors – (1) to Dr. Pepper that Dr. DelToro recommended, and she attempted, further physical therapy, when he actually also proposed a spinal cord stimulator (SCS); and (2) to Dr. DelToro that she had only engaged in "a week or two" of physical therapy, when she had in fact engaged in at least 22 sessions over two months, which the ALJ viewed as supporting an inference of drug-seeking behavior and an attempt "to rewrite history." R. 17. Additionally supporting such an inference is the fact that Ms. Rochek began seeing Dr. Mudry in October 2010, who prescribed her painkillers (and at a greater dosage than Dr. Pepper), at the same time she stopped seeing Dr. Pepper, who increasingly made clear he considered that treatment a "failed treatment plan" and failed to increase her dosage.

But importantly, that same October 1, 2010 report from Dr. Pepper that indicated that Ms. Rochek was dependent on opioids also noted that she "demonstrates no pain behavior or symptom magnification" – in other words, that she was not exaggerating the level of her pain.[2]

---

[2] It also appears that the ALJ considered Dr. Pepper's observations of a lack of "pain behavior" to imply that Ms. Rochek was not experiencing or signifying her pain. But it appears more likely that "pain behavior" instead refers to something akin to feigning of pain, given that it is always listed alongside "symptom magnification" and "drug-seeking behavior" in Dr. Pepper's notes, and "no pain behavior" is noted in the same reports that discuss Plaintiff's complaints of pain. R. 270; *see also Diaz v. Astrue*, 1:10CV034 DLB, 2011 WL 1344640, at *12 (E.D. Cal. Apr. 8, 2011) ("pain behaviors" reason to reject Plaintiff's complaints); *Latta v. Astrue*, 482 F. App'x 261, 262 (9th Cir. 2012) ("pain behaviors" weigh against claimant's credibility); *Kibble v. Astrue*, CV-12-24-GF-SEH-RKS, 2013 WL

On only one occasion, September 9, 2009, did Dr. Pepper observe what he described as possible "symptom magnification," out of the several times he saw her over a three year span. R. 586-87. Indeed, the evidence over the years following Ms. Rochek's surgery is replete with indicia that her back impairment continued to be severe, including Dr. Spiro's recommendation, upon seeing the results of a CT scan in March 2009, that Ms. Rochek undergo a second surgery; Dr. Maroon's observations that a post-surgery MRI of Ms. Rochek's lower back showed "degenerative disk disease", R. 451; Dr. Pepper's observations that that MRI showed significant "disc degeneration," R. 474; Dr. Pepper's continued treatment of Ms. Rochek over years and noted impression that she suffered from chronic lower back pain, even while he began to fear of her growing independence on the opioids; and Dr. Pepper's and Dr. DelToro's concurring recommendations that Ms. Rochek undergo a spinal cord stimulator trial, which requires a minimally invasive surgery. While it was clear that on some level, Ms. Rochek was "satisfied" with the results the oral painkillers were producing, and reported that it was assisting her in managing her pain, it is far from clear that she still would not have been "disabled" based on her well-documented and supported impairment. Put differently, without the aid of oxycodone, it is very likely that Ms. Rochek may have been suffering from debilitating pain, and even with the aid of oxycodone, she may have still been disabled within the meaning of the statute.

Related to the ALJ's findings on opioid dependence is his finding on refusal of treatment. He notes accurately that Ms. Rochek had consistently refused any of the other procedures recommended by her doctors, including physical therapy, muscle relaxers, surgery, and SCS. R. 17. But he did not seriously consider whether Ms. Rochek had legitimate reasons for refusing each of them, as he must. *See Kinney v. Comm'r of Soc. Sec.*, 244 F. App'x 467, 470 (3d Cir.

654196 (D. Mont. Feb. 4, 2013) *report and recommendation adopted*, CV 12-24-GF-SEH, 2013 WL 654192, at *5 (D. Mont. Feb. 21, 2013) (pain behavior "apparently refers to feigned or exaggerated displays of pain").

2007) (citing Social Security Ruling 96–7p, 1996 WL 374186, at *7) (noting that, when an ALJ draws an adverse inference from a claimant's failure to seek treatment, he must first consider "any explanations that the individual may provide, or other information in the case record, that may explain . . . failure to seek medical treatment."). Here, the ALJ did not seriously consider whether Ms. Rochek had legitimate reasons for failing to undergo SCS, a second surgery, or aggressive physical therapy, such as limited financial resources, R. 48, 64, 581, or apprehension over the likelihood of success of a second surgery, R. 57; he had already come to the conclusion that for Ms. Rochek, the only issue was "how [she] can continue to procure her opiates." R. 17. Furthermore, it is not the case here that Ms. Rochek refused *all* medical treatment – she just refused all treatments except for one, oral opioids. In other words, an individual's refusal of all medical treatment is more powerful evidence that she does not suffer a disability than the fact that she has accepted exactly one medical treatment. Therefore, the ALJ erred in using Ms. Rochek's failure to seek other treatments as nearly conclusive evidence that she was not experiencing real debilitating pain.

Another member of this Court considered and found error under facts very similar to those here. In *Turnbull v. Comm'r of Soc. Sec.*, 2:07-CV-1470, 2009 WL 688911 (W.D. Pa. Mar. 12, 2009), the ALJ had also refused to find the complaint's complaints of back pain as credible because of evidence he was addicted to painkillers. The court noted that while the record did indeed support instances of drug-seeking behavior, "the objective medical evidence fails to support the notion that Plaintiff's behavior was driven by a need simply to obtain narcotics for the purpose of drug addiction." *Id.* at *14. It continued,

> In short, the ALJ did not adequately evaluate the record in reaching his finding
> that Plaintiff was addicted to narcotics and therefore his complaints of pain and
> claims of functional limitation lacked persuasive credibility. It is clear that
> Plaintiff had a high tolerance to narcotic medication. Further, although there is

14

significant evidence throughout the record that Plaintiff over-used narcotic medication, time and again he continued to receive the medications from doctors who documented his problems with both severe pain and medication abuse and thereby recognized his need for such strong medications. There is substantial evidence throughout the record that Plaintiff suffers from a great deal of pain and use of such strong, addictive narcotic medications continues to be necessary and warranted medically. Because there were medical bases for Plaintiff's complaints and the treating sources did not doubt the existence of Plaintiff's pain, the ALJ erred in failing to accord proper weight to this aspect of the record.

*Id.* at *15. The Tenth Circuit has also adopted this rationale. *See Saleem v. Chater*, 86 F.3d 176, 179 (10th Cir. 1996) ("The net result of the ALJ's decision is that [Plaintiff] is to return to work, addicted, because her drug abuse will keep her from feeling severe pain.").

As in *Turnbull*, Dr. Pepper continued to prescribe Ms. Rochek high doses of opioids even after recognizing her potential dependence on them, powerful evidence of his belief that real and severe pain necessitated that medication. The record is full of evidence of her actual severe pain, and the evidence of malingering is scant – "the treating sources did not doubt the existence of Plaintiff's pain." *Turnbull*, 2009 WL 68911, at *15. To be sure, evidence of drug-seeking behavior can undermine a claimant's credibility generally, and the severity of her impairments more specifically. *See, e.g.*, *Berger v. Astrue*, 516 F.3d 539, 545–46 (7th Cir. 2008). But it is certainly not always so, and the ALJ erred in rushing to that assumption here, over the powerful objective evidence of Ms. Rochek's continued impairment.

## B. RFC Assessment of Pain: Medical Opinions

Relatedly, Ms. Rochek also argues that the ALJ erred by affording Dr. Mudry's opinion little weight, citing the "treating physician rule." It is well settled in this Circuit that "[a]n ALJ should give 'treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 355 (3d Cir. 2008) (quoting

*Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)) (some internal marks omitted). In response, the government argues that Dr. Mudry's opinion was properly not relied upon because (1) it is a check box form, which is not entitled to great weight, and (2) it was contrary to the weight of the evidence and inconsistent with Dr. Mudry's own treatment notes. The government is correct that "form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best." *Zonak v. Comm'r of Soc. Sec.*, 290 F. App'x 493, 497 (3d Cir. 2008) (quoting *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)). Even so, however, the ALJ's decision to discredit the opinion was not supported by substantial evidence.

Unlike the government's brief, the ALJ never noted Dr. Mudry's opinion was rejected because it was internally inconsistent, but rather only that it was contrary to the weight of the evidence "as a whole." R. 17. The ALJ reasoned, "[a]gain, improvement has been noted postoperatively with physical therapy and there is no evidence of lasting neurologic deficit." R. 17. This finding was not supported by substantial evidence in the record – rather, it seems to be directly contrary to the observations of Dr. Spiro and Dr. DelToro based on MRI and CT scans that showed evidence of continued structural back problems for Ms. Rochek. And as noted above, the ALJ's decision to view the entire record, including the veracity of Ms. Rochek's pain, through the lens of Ms. Rochek's possible addiction to pain medication, was not supported by substantial evidence and was based on flawed reasoning. The finding also contained no support in the form of a contrary physician's opinion. Therefore, although Dr. Mudry's check-box opinion is not entitled to the full weight that would otherwise support a treating physician's opinion, the ALJ did not refer to competent medical evidence in the record refuting it. *See Sylvester v. Comm'r of Soc. Sec.*, Civ. A. No. 10-1012, 2011 WL 470257, at *13 (W.D. Pa. Feb. 4, 2011).

Also, as occurred in *Sylvester*, the ALJ here might have been able to rely on the opinion of a consultative examiner whose opinion contradicted that of the treating physician. *Id.* Here, Dr. Ali had opined that Plaintfif could stand/walk up to 6 hours a day, and sit up to 6 hours a day. R. 550. But the ALJ's decision made no mention of Dr. Ali's opinion, and it is well settled that this Court "cannot substitute its own factual findings to rectify a flawed decision by an ALJ." *Sylvester*, 2011 WL 470257, at *13 (citing *Fargnoli v. Massanari*, 247 F.3d 34, 44 n.7 (3d Cir. 2001)). Accordingly, the ALJ's opinion was not supported by substantial evidence, and cannot stand.

## C.     Decision to Remand

The remaining issue is whether the case should be remanded to the Commissioner or reversed with a direction to award benefits to Plaintiff. *Morales,* 225 F.3d at 320. "[T]he decision to . . . award benefits should be made only when the administrative record has been fully developed and when substantial evidence in the record as a whole indicates that the claimant is disabled and entitled to benefits." *Id.* (quoting *Podedworny v. Harris,* 745 F.2d 210, 222 (3d Cir. 1984)). Here, remand is warranted, so that the ALJ may weigh the medical and opinion evidence in a manner that does not equate possible painkiller addiction with the absence of pain.

On remand, it may be that the ALJ finds the Social Security regulations pertaining to drug and alcohol abuse to be relevant, and finds that but for her opioid addiction, Ms. Rochek would not be disabled. *See, e.g., Lambert v. Astrue*, CIV A 08-657, 2009 WL 425603 (W.D. Pa. Feb. 19, 2009) ("an individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled.") (quoting 42 U.S.C. § 423(d)(2)(C)). It also may be that the ALJ finds the Social Security regulations pertaining to refusal of treatment to be relevant, and finds that

while Ms. Rochek would otherwise be disabled, given her unjustified refusal to follow a prescribed method of treatment, she is not entitled to benefits. *See, e.g., Sharp v. Bowen*, 705 F. Supp. 1111, 1123-24 (W.D. Pa. 1989) (citing 20 C.F.R. § 416.930)). And it also may be that the ALJ would choose to rely on the opinion of Dr. Ali or another CE over Dr. Mudry in arriving at an RFC assessment. But what the ALJ may not do is what he did previously – determine that because Ms. Rochek may be addicted to opioids, and because she has refused all other treatments alone, her underlying ailments necessarily must not be genuine and her treating examiner's opinion must be afforded little weight.

### D.     Plaintiff's Hearing Impairment

Plaintiff also asserts that the ALJ erred in (1) not sufficiently incorporating into his RFC assessment the limitations Plaintiff might experience due to her "severe impairment" of "congenital sensorineural hearing loss by history," R. 12, of which the ALJ had found that she suffered; and (2) that his hypothetical questions to the Vocational Expert (VE) included no "description whatsoever of Rochek's hearing loss." Pl.'s Br. at 21, ECF No. 12. The government responds that any error relating to Ms. Rochek's hearing is harmless.

The ALJ's RFC assessment included that Plaintiff "should avoid exposure to loud noise without hearing protection." R. 14. The ALJ incorporated that limitation into his hypothetical question to the VE. R. 75. Therefore, while Plaintiff's brief focuses its factual and legal attack on the quality of the hypothetical questions offered to the VE, this is one of the cases where more accurately, the "objections to the adequacy of hypothetical questions posed to a vocational expert . . . are really best understood as challenges to the RFC assessment itself." *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005).

Considering first whether there was error in the RFC assessment at all, the ALJ's decision does not have much to offer in the way of explanation of Ms. Rochek's hearing impairment. The ALJ found that Plaintiff requires the use of bilateral hearing aids, and relying on the report of Consultative Examiner Dr. Jeffrey Banyas, concluded she "does indeed suffer from congenital sensorineural hearing loss." R. 12-13. His only other discussion of Ms. Rocheck's hearing observed, however, that her "wor[d] recognition was actually 52% in her better ear uncorrected and noted 80% discrimination with hearing aids," which the ALJ used to reject Plaintiff's counsel's assertions that her word recognition was 40% or less, R. 18, and to conclude that a "work-related restriction with regard to noise exposure" would sufficiently accommodate that impairment, R. 13.

A review of Dr. Banyas' notes does not offer great clarification. His written report notes "[s]peech discrimination was 32% in the right and 40% in the left," R. 544, but the "Audiologic Evaluation" chart notes values of 52% for "discrimination" in the right ear and 40% in the left, R. 545. The written report makes no mention of the results with a hearing aid, but the chart suggests 80% discrimination corresponding with "SFA" and an annotation that "A= Aided w/ hearing aid." R. 544-45. It does characterize Plaintiff's speech discrimination as "fair-to-poor." R. 544. Though Plaintiff has not argued here that the ALJ erred in failing to find that Ms. Rochek's hearing impairment met one of the listed impairments as defined in 20 C.F.R. Pt. 404, Subpt. P, App. 1, whether the 52% or 32% value was chosen might have altered that outcome, since Listing 2.10B notes a score of "40% or less" in the better ear.

The ALJ's decision does not discuss why he chose the 52% value over the 32% value. It also does not discuss why he considered the sole significance of those test results to be an increased sensitivity to noise. It does not include any discussion of other evidence in the record

19

relating to Ms. Rochek's hearing – either weighing for or against a limitation – such as (1) her testimony that given her difficulty hearing, her husband needs to help her interpret things "all the time," R. 60; (2) Dr. Mudry's notes that Plaintiff suffers from "decreased hearing bilaterally," R. 598, but that do not reflect that he ever treated her for that condition; or (3) Dr. Ali's opinion that her hearing was "limited". R. 552. Finally, the decision does not in any way explain the functional meaning of the hearing discrimination results: *why* 80% discrimination with the assistance of a hearing aid is the relevant consideration, and *how* that result translates into no noteworthy limitation of Plaintiff's hearing for the purposes of engaging in substantial gainful activity. *See Fargnoli*, 247 F.3d at 41 (ALJ's RFC "findings should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which ultimate factual conclusions are based, so that a reviewing court may know the basis for the decision.") (quoting *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)). On remand, the ALJ will have the opportunity to further explain the evidence on which he relied in concluding that while Plaintiff suffers from a "severe impairment" regarding her hearing, the only ramification of that hearing on Plaintiff's ability to work is that she wear noise protection.

Turning to whether any such error might have been harmless, the government argues that according to the Dictionary of Occupational Titles (DOT), two of the three jobs explained by the VE that Plaintiff could perform, which exist in significant numbers in the national economy, do not require *any* hearing. Those two jobs are "Bench Worker" (239,000 jobs existing nationally/9,300 regionally, R. 17), DOT 616.485-010, 1991 WL 685069 (1991); and "Sorter" (430,000 jobs existing nationally/21,000 regionally, R. 17). Although the Government has cited DOT 616.485-101 as corresponding to the "sorter position," Gov. Reply Br. 8, ECF No. 13, it does not appear that there is any position under that provision of the DOT, and neither the ALJ's

decision nor the VE's testimony refer to any specific DOT provision accompanying the grader/sorter position. Therefore, the Court cannot presently evaluate whether the grader/sorter position would have been available to Ms. Rochek under any circumstances outside the VE's testimony.

Turning to the Bench Worker position, the DOT does describe for the skills of "talking" and "hearing": "Not present. Activity or condition does not exist." DOT 616.485-010. However, it requires the skill of "speaking": "Speak clearly and distinctly with appropriate pauses and emphasis, correct punctuation, variations in word order, using present, perfect, and future tenses." *Id.* In the Court's view, the fact that the skill of "speaking" must involve "talking," although the latter is listed as "not present," injects uncertainty into the DOT definition, and similarly casts aspersion on the "hearing" requirement – ordinarily also an important component of communication. Additionally, given this Court's relative lack of expertise in interpretations of the DOT, and of the communicative requirements for occupations more broadly, as compared to a VE, the Court cannot definitively say at this point that any hearing impairment of Plaintiff's would have *no* effect on her ability to perform as a bench worker.

It is true that a number of other courts have found harmless error where an alleged limitation that was not included in the ALJ's hypothetical (or in the RFC) was not necessary to perform one or more of the jobs identified by the VE, according to the DOT. *E.g. Caldwell v. Barnhart*, 261 F. App'x 188, 190 (11th Cir. 2008) (environmental exposure); *Powell v. Astrue*, CIV. SKG 10-02677, 2013 WL 3776948, at *9 (D. Md. July 17, 2013) (collecting Fourth Circuit district court cases). However, other courts have refused to find harmless error in certain circumstances, such as when numerous components factor into each occupation under the DOT. *E.g. Greenwood v. Barnhart*, 433 F. Supp. 2d 915, 928 (N.D. Ill. 2006) (observing "the reality

that occupational availability is the VE's expertise and not the Court's."). Taken together, the uncertainty over the exact nature of the grader/sorter position identified by the VE and the ALJ, the uncertainty over the precise hearing requirement of the bench worker DOT definition, and the fact that, as explained above, this case will be remanded in any event, suggest that the better course here is for the Court to decline to find harmless error, and allow the appropriately evaluated hearing limitations of the RFC to be explicitly factored into the testimony of the VE, who enjoys the greatest expertise in this area.

## VI.    CONCLUSION

Based upon the foregoing, the Court finds that ALJ's decision is not supported by substantial evidence. Accordingly, Plaintiff's Defendant's Motion for Summary Judgment, ECF No. 9, will be DENIED. Plaintiff's Motion, ECF No. 11, will be GRANTED IN PART, to the extent that the Court remands the case to the Commissioner for reconsideration consistent with this Opinion, and DENIED IN PART, to the extent that it seeks the directing of an award of benefits. The Commissioner's "final decision" in this case will be vacated.

An appropriate order will issue.

Mark R. Hornak
United States District Judge

Dated: August **23**, 2013

cc:     All counsel of record